IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| CARLA R. LAYNE, )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>CAROLYN W. COLVIN, )<br>Acting Commissioner, )<br>Social Security Administration, )<br>    Defendant. ) | Civil Action No. 5:14cv00014<br><br>By:    Joel C. Hoppe<br>United States Magistrate Judge |

## REPORT AND RECOMMENDATION

Plaintiff Carla R. Layne asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–422, 1381–1383f. This Court has authority to decide Layne's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and her case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Commissioner's final decision that Layne is not disabled.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

2

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Layne protectively filed for DIB and SSI in June 2011. *See* Administrative Record ("R.") 182, 189. She was 27 years old, *id.*, and had previously worked as a retail worker, fast food sandwich maker, and fast food restaurant manager, R. 33, 85–86. Layne alleged disability beginning January 6, 2011, because of arthritis, lupus, kidney disease, factor V Linden deficiency,[1] Raynaud's disease,[2] high blood pressure, and back problems. R. 79, 88. The state agency denied her applications initially in August 2011, and upon reconsideration in December 2011. R. 87, 96, 109, 120.

On October 16, 2012, Layne appeared with counsel for an administrative hearing before ALJ Mark O'Hara. R. 14. She testified about her alleged impairments and the limitations those impairments caused on her functional activities. R. 44–68. A vocational expert ("VE") also testified about Layne's past relevant work, the effect of postural and environmental limitations

---

[1] Factor V Leiden "is a mutation of one of the clotting factors in the blood called factor V. This mutation can increase your chance of developing abnormal blood clots (thrombophilia), usually in your veins." *Factor V Leiden: Definition*, Mayo Clinic (Sept. 6, 2012), http://www.mayoclinic.org/diseases-conditions/factor-v-leiden/basics/definition/con-20032637.

[2] Raynaud's disease "causes some areas of your body — such as your fingers and toes — to feel numb and cold in response to cold temperatures or stress. In Raynaud's disease, smaller arteries that supply blood to your skin narrow, limiting blood circulation to affected areas (vasospasm)." *Raynaud's Disease: Definition*, Mayo Clinic (Mar. 4, 2015), http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916.

3

on the sedentary job base, and the availability of jobs for persons with limitations like those Layne alleged. R. 68–75.

In an opinion dated December 26, 2012, the ALJ concluded that Layne was not disabled under the Act. R. 34. He found that Layne suffered from eight severe impairments: "obesity, systemic lupus erythematosus (SLE),[3] factor 5 Leiden deficiency, chronic kidney disease, history of seizure disorder, idiopathic thrombocytopenic purpura (ITP),[4] history of venous insufficiency, and a back disorder." R. 16–17. He determined that none of these impairments, alone or in combination, met or equaled the severity of a listed impairment. R. 19–21. The ALJ found that Layne had the residual functional capacity ("RFC")[5] to perform sedentary work,[6] though she cannot climb ladders, ropes, or scaffolds and should avoid moderate exposure to workplace hazards. R. 21–33. With this RFC and Layne's age, education, and work experience, the ALJ found that the Medical-Vocational Rules ("the Grids") 201.27–201.29 directed a finding of not disabled. R. 34. *Id.* The Appeals Council denied Layne's request for review, R. 1–4, and this appeal followed.

---

[3] "Systemic lupus erythematosus (SLE) is an autoimmune disease in which the body's immune system mistakenly attacks healthy tissue. It can affect the skin, joints, kidneys, brain, and other organs." *Systemic Lupus Erythematosus*, Nat'l Inst. of Health, http://www.nlm.nih.gov/medlineplus/ency/article/000435.htm (last updated Mar. 2, 2015).

[4] "Idiopathic thrombocytopenic purpura (ITP) is a disorder that can lead to easy or excessive bruising and bleeding. The bleeding results from unusually low levels of platelets." *Idiopathic Thrombocytopenic Purpura (ITP): Definition*, Mayo Clinic (Dec. 10, 2014), http://www.mayoclinic.org/diseases-conditions/idiopathic-thrombocytopenic-purpura/basics/definiteon/con-20034239.

[5] "RFC" is a claimant's maximum ability to work "on a regular and continuing basis" despite his or her impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the claimant's record and must reflect the "total limiting effects" of his or her impairments. 20 C.F.R. §§ 404.1545, 416.945.

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools. . . . Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

4

III. Discussion

On appeal, Layne generally asserts that the ALJ's RFC determination is flawed and she cannot perform the full range of sedentary work. Specifically, she argues that the ALJ gave too little weight to the opinions of her primary care physician and too much weight to those from state-agency examiners. *See generally* Pl. Br. 7–13, ECF No. 15. So also argues that the ALJ should have called a medical expert to testify at her hearing. *Id.* at 9.

A. *Medical-Source Opinions*

   1. *Relevant Medical Evidence*

Layne was diagnosed with systemic lupus erythematous ("SLE") in 1999 at age 15. R. 391, 426. Over the next six years, she developed additional medical conditions, including: factor V Leiden deficiency, deep vein thrombosis ("DVT"),[7] Lupus nephritis,[8] Raynaud's disease, pericarditis leading to a pericardectomy,[9] hypertension, and a seizure disorder. *Id*. Though some

---

[7] "Deep vein thrombosis (DVT) occurs when a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs. Deep vein thrombosis can cause leg pain or swelling, but may occur without any symptoms." *Deep Vein Thrombosis (DVT): Definition*, Mayo Clinic (July 3, 2014), http://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/basics/ definition/con-20031922.

[8] "Lupus nephritis is kidney inflammation caused by systemic lupus erythematosus." *Lupus Nephritis,* Nat'l Inst. of Health, http://kidney.niddk.nih.gov/KUDiseases/pubs/lupusnephritis/index.aspx (last updated Apr. 2, 2014).

[9] "Pericarditis is swelling and irritation of the pericardium, the thin sac-like membrane surrounding your heart. Pericarditis often causes chest pain and sometimes other symptoms." *Pericarditis: Definition*, Mayo Clinic (Apr. 6, 2014), http://www.mayoclinic.org/diseases-conditions/pericarditis/basics/definition/con-20035562. A pericardiectomy "is the surgical removal of a portion or all of the pericardium" and is used to address pericarditis. *Pericardiectomy*, Cleveland Clinic, http://my.clevelandclinic.org/services/heart/services/pericardiectomy (last updated Jan. 2014).

5

treatment notes appear to be missing,[10] the record reflects that from at least 2004 and 2005 onward, Layne received care for her conditions at the University of Virginia Health Systems ("UVAHS") Cancer Center Clinic, R. 421–28, and Nephrology Clinic, R. 417–20.

In 2009, Layne pled guilty to distribution of methamphetamine and embezzling from her employer, Arby's. R. 64–65. She was incarcerated for "about two years" from the middle of 2009 through the beginning of 2011. R. 64. Layne received care at UVAHS only once during her incarceration. R. 327 (Jan. 19, 2010, treatment note from the Nephrology Clinic).

After her release, Layne renewed treatment at UVAHS on April 29, 2011. R. 325 ("[Layne] has not been seen in clinic for a while [sic] due to recent incarceration as well as noncompliance."). Dr. Mitchell Rosner, M.D., in the Nephrology Clinic noted that Layne had "been out of her medications for about a month" and was complaining of some joint stiffness, occasional facial rash, some peripheral edema, and intermittent right leg numbness. *Id.* On examination, Dr. Rosner did not find evidence of rash, joint effusion, or edema. R. 326. He renewed her medications, ordered tests for her lupus and renal conditions, and referred her to a primary care physician. *Id.*

On June 8, 2011, Layne began seeing Dr. Marisa D. Christensen, M.D., for primary care. R. 391–93. Dr. Christensen listed her medical history as: systemic lupus, factor V Leiden deficiency, Raynaud's syndrome, rheumatoid arthritis, seizure disorder, hypertension, chronic renal insufficiency, and history of pericardiectomy for lupus-associated pericarditis. R. 391. Layne reported experiencing low-back pain and some right leg numbness and aching. *Id.* On examination, Dr. Christensen found some tenderness in her lumbar paraspinal muscles bilaterally and some decreased reflexes at her knees. R. 392. Layne did not endorse pain from a straight leg

---

[10] The earliest record from UVAHS is a follow-up appointment dated July 30, 2004. R. 425–28. It states that Layne was previously seen in 2001, but there are no records from that visit. R. 426.

6

raise test, and Dr. Christensen found no significant joint deformity or swelling, no spasm, and no cyanosis, clubbing, or edema in her extremities. *Id.* She assessed that Layne "probably has some nerve root irritation, but [I] suspect this can be treated conservatively." R. 393. Dr. Christensen also noted that Layne's autoimmune and renal issues were being handled by doctors at UVAHS. R. 391; *see also* R. 836 ("[T]he main issues I am following through this office are her back pain, depression, and coordinating care for her multiple problems.").

On June 14, 2011, Layne returned to the UVAHS Nephorlogic Clinic. R. 321–22. She claimed to "overall feel[] better," though she reported "some leg numbness and back pain" and "some knee joint swelling and morning joint stiffness." R. 322. On examination, Dr. Rosner found some mild left knee effusion, but no edema. *Id.*

On July 5, 2011, Layne saw Dr. Waleed Bolad, M.D., at UVAHS. R. 319–21. Dr. Bolad noted that she had some tenderness, but no edema or joint swelling, and he concluded that Layne had "a mild lupus flare" due to being off some of her medications while incarcerated. *Id.*

On November 7, 2011, Layne told Dr. Christensen that she had two seizures in the past two weeks. R. 410. Her last seizure before this incident was in 2008. *Id.*; R. 391. Layne had taken tramadol for her back pain within a month of these seizures, and Dr. Christensen concluded that they were induced by the new medication. R. 410–11. The record does not contain evidence of any seizures after this date.

Layne's lupus flare also led to a diagnosis of idiopathic thrombocytopenic purpura ("ITP") in November 2011. R. 472–74. Layne was briefly admitted to UVAHS by Dr. Laura Brett, M.D., to undergo steroid treatment for her ITP. R. 469–75. Dr. Brett noted that she responded well to treatment. R. 470. On December 9, 2011, Dr. Brett reported that Layne's ITP was stable, and she determined to begin tapering Layne's steroid intake. R. 468. By January 20,

7

2012, Dr. Brett noted that Layne's platelet count was satisfactory on her normal immunosuppressant dosage, though she wanted to continue regular testing to ensure Layne remained stable. R. 462.

Medical records from 2012 and 2013 indicate that Layne's autoimmune and renal conditions were stable following her post-incarceration flare-up. On January 24, 2012, Layne denied worsening malaise, decreased urine output, or increased joint pain or swelling. R. 675. On May 8, 2012, Dr. Emmanuel Nketlah, M.D., of UVAHS recorded that Layne denied fatigue, myalgias, weight changes, or fever and had remained stable since her last appointment. R. 783. Laboratory testing conducted the same day indicated that Layne's kidney function and hemoglobin were stable, she showed no signs or symptoms of a lupus flare, and she had not experienced an ITP event since she was seen in December 2011. R. 785–86. On June 22, 2012, Dr. Brett recorded that Layne's factor V Leiden deficiency and ITP were managed by medication and her platelets were "under excellent control." R. 778. On January 18, 2013, Dr. Brett, wrote that "Ms. Layne is doing well, with normal platelet and hemoglobin today. Her ITP appears to be quiescent. Her last APLS labs were normal." R. 855.

On August 29, 2012, Layne reported worsening pain and swelling in her right lower leg. R. 837. Dr. Christensen found her symptoms consistent with venous insufficiency and recommended Layne wear compression stockings. R. 837–38. On September 19, 2012, Layne reported that the stocking significantly helped and that her pain was under control with medication. R. 833.

On January 20, 2013, Layne presented to the Augusta Health Emergency Department complaining of right foot pain. R. 883–84. Layne had some redness across the plantar aspect of her foot, but had full range of motion, strength, and reflexes and no weakness, numbness, or

8

other symptoms. R. 883. An X-ray showed no abnormalities. R. 882. The attending physician suspected cellulitis[11] and prescribed antibiotics. R. 884. On January 24, Dr. Christensen confirmed the cellulitis diagnosis and noted that Layne had experienced a significant decrease in erythema and swelling after taking the antibiotics. R. 843.

In addition to her chronic conditions, Layne also received treatment for transient medical issues from 2012 through 2013. On May 31, 2012, Layne presented to the Augusta Health Emergency Department complaining of shortness of breath, cough, chills, and fever. R. 691–94. An X-ray found fluid in the left lower lobe of her lung consistent with pneumonia. R. 694, 696. By the following morning, her symptoms had resolved, and she was discharged with a diagnosis of pneumonia and a prescription for antibiotics. R. 688–90. Her admission records also stated that her chronic kidney disease, factor V Leiden deficiency, and ITP were all stable. R. 694.

   2.   *Analysis*

Layne asserts that the ALJ improperly rejected the opinions of Dr. Christensen and gave too much weight to the state-agency medical examiner's opinions. Pl. Br. 7; R. 32. An ALJ must consider and evaluate medical opinions in the case record from acceptable sources, such as physicians. 20 C.F.R. §§ 404.1527, 416.927. A medical opinion is a statement "that reflects judgments about the nature and severity of [a claimant's] impairments," including their symptoms, diagnosis and prognosis, capability, and restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Generally, an ALJ determines the weight to afford a medical opinion by considering certain factors, including whether the doctor examined the claimant, the relationship between the doctor and the claimant, the degree to which the opinion is supported or contradicted

---

[11] Cellulitis "is a common, potentially serious bacterial skin infection. Cellulitis appears as a swollen, red area of skin that feels hot and tender." *Cellulitis: Definition*, Mayo Clinic (Feb. 11, 2015), http://www.mayoclinic.org/diseases-conditions/cellulitis/basics/definition/con-20023471.

9

by other evidence in the record, and whether the doctor's opinion pertains to his or her area of specialty. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65 (4th Cir. 2014) (per curiam) (citing *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005)); 20 C.F.R. §§ 404.1527(c), 416.927(c).

The regulations extend additional deference to the opinions of physicians who have treated the patient, and an ALJ must give a treating-source opinion "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ may reject a treating physician's opinion only if there is "persuasive contrary evidence" in the record, *Mastro*, 270 F.3d at 178, and he must provide "good reasons" for that decision, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, opinions on dispositive issues reserved to the Commissioner, such as whether the claimant is disabled and what residual functional capacity she or he has, are not considered medical opinions, and ALJs do not give any special significance to the source of an opinion on such issues. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Layne's primary care physician, Dr. Christensen, did not write a separate medical opinion, but rather included her impressions of Layne's condition within her treatment notes. On September 26, 2011, Dr. Christensen stated:

> Patient is pursuing disability. I support her pursuit of disability, given her multiple severe chronic medical conditions including lupus, seizures, rheumatoid arthritis, chronic kidney disease, as anyone of these diseases by themselves might not be significant enough to cause disability, the constellation of these multiple different diseases makes it difficult for patient to obtain and maintain gainful employment.

R. 414. On August 29, 2012, Dr. Christensen wrote: "I am very hopeful that this young lady who unfortunately is horribly disabled from multiple complicated medical conditions will get

10

disability." R. 839. These characterizations of Layne as "disabled" are not medical opinions under the regulations. Whether a claimant is disabled is an issue explicitly reserved to the Commissioner, and these statements express only Dr. Christensen's belief that Layne's impairments make her disabled. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Such statements deserve no special weight, and an ALJ should evaluate them in light of the entire record. SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996).

> The ALJ rejected Dr. Christensen's "multiple conclusory opinions," finding them
>
> not supported by the longitudinal record with its limited back findings and routine and conservative treatment, including her own treatment notes with generally unremarkable imagery and physical examination findings, as well as the fact that other treating sources and specialists have not suggested that the claimant cannot work at all.

R. 32–33. Each reason is amply supported by the record, which the ALJ thoroughly evaluated, R. 22–31. Considering the ALJ's reasons in light of the longitudinal record, substantial evidence supports his decision to reject Dr. Christensen's opinions. *See, e.g.*, *Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the opinion mirrored Bishop's subjective complaints and was "inconsistent with the mild to moderate diagnostic findings, the conservative nature of Bishop's treatment, and the generally normal findings during physical examinations").

Concerning Layne's autoimmune and renal diagnoses, Dr. Christensen acknowledged that she was not the primary treating physician for these issues. R. 836. Records from UVAHS physicians who did provide treatment indicate that Layne experienced a flare in her lupus and related conditions in late 2011 after she was briefly off her medications for reasons related to her incarceration. R. 319–22, 325–26. By 2012, records reflect that the flare had abated and her conditions had stabilized. *See* R. 783 (May 8, 2012: "patient has remained stable" since last visit,

11

including stable kidney function and hemoglobin, no signs of lupus flare, and no ITP events since December 2011); 778 (June 22, 2012: Layne's "APLS and factor V Leiden are managed with enoxaparin" and her platelets are "under excellent control"); 855 (Jan. 18, 2013: "Layne is doing well, with normal platelet and hemoglobin today. Her ITP appears quiescent. Her last APLS labs were normal."). These records do not support Dr. Christensen's claims that Layne is completely disabled.

Concerning Layne's back pain and arthritis, diagnostic imaging and tests consistently returned only mild findings. An X-ray of Layne's lumbar spine on November 27, 2007, showed "[m]ild chronic compression deformity of the T11 vertebral body" with "[n]o acute fracture, malalignment, or significant degenerative changes." R. 362. An X-ray on June 14, 2011, showed the same. R. 685. Dr. Christensen reviewed the June 2011 X-ray and noted that it showed no signs of arthritis. R. 389. She stated that the mild T11 deformity could contribute to "some back pain" and recommended physical therapy. *Id.* She also expressed concern about Layne's bone density and recommended testing. *Id.* A test in November 2011 showed that Layne had normal bone density in her lumbar spine, femoral neck, and hip. R. 684. An X-ray of Layne's hip on November 15, 2012, was "unrevealing," R. 862, and an X-ray of Layne's ankle on January 20, 2013, was "neg[ative] for fracture or other abnormality," R. 840, 882.

Physical examinations of Layne's back and lower extremities were likewise consistently mild. Examinations from September and November 2011 had the most severe findings concerning Layne's back condition. On September 26, 2011, Layne displayed pain on a straight leg raise test and lumbar paraspinal tenderness, but had full strength in her lower extremities, no edema, and no complaints of numbness in her legs. R. 413. On November 7, 2011, Layne had pain on a straight leg raise test and lumbar paraspinal tenderness and spasm, but normal reflexes.

12

R. 411. A month later, physical examinations revealed only occasional tenderness. *See* R. 471 (Dec. 2, 2011: musculoskeletal examination noted only normal range of motion in extremities, no edema) 467 (Dec. 9, 2011: same), 681 (Dec. 14, 2011: lumbar back tenderness noted, but she had full range of motion in back and lumbar spine and no sign of edema, deformity, swelling, or spasm). The rest of the record contains consistently mild findings. *See, e.g.*, R. 387 (July 20, 2011: some spinal tenderness noted, but no pain on a straight leg raise test, full strength in both extremities, and normal reflexes), 835 (Sept. 19, 2012: some tenderness noted, but no spasm or pain on a straight leg raise test and full lower extremity strength), 853 (Jan. 18, 2013: normal range of motion and no edema). As the ALJ found, these consistently mild diagnostic and examination findings do not support Dr. Christensen's assertion of complete disability.

The ALJ also cited Layne's routine and conservative treatment as a reason to reject Dr. Christensen's opinions. R. 19. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment," *Gill v. Astrue*, No. 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), an unexplained inconsistency between a practitioner's characterization of her patient's condition and the treatment she prescribes for that condition can weigh against the practitioner's opinion, *Bishop*, 583 F. App'x at 67. Dr. Christensen treated Layne's conditions with measures that she deemed "conservative[]," including medication, home exercise, and suggested physical therapy.

At oral argument, Layne's counsel stressed that Layne's treatment has been conservative because her conditions preclude surgery, not because her impairments lack severity. There is no evidence that Layne in unable to undergo surgery. Dr. Christensen stated on January 24, 2012, that Layne was "not a candidate for surgical procedures to treat" her back condition. R. 675. When discussing Layne's back condition, Dr. Christensen also wrote: "I suspect this can be

13

treated conservatively," R. 383 (June 8, 2011), "physical therapy will be helpful for [her] symptoms," R. 389 (June 21, 2011), "her prognosis for improvement in her pain is good with weight loss [and] ongoing home exercise," R. 388 (July 20, 2011), and "significant weight loss will be the number one thing she can do to help herself with back pain," R. 791 (Apr. 5, 2012). Furthermore, a treatment note from January 18, 2013, relates that Layne "has been seen by surgery to evaluate for elective cholecystectomy." R. 853. Dr. Christensen's comments—and the medical record as a whole—relate that Layne's back condition does not warrant surgery, not that her medical conditions preclude it. The ALJ was justified in using the disparity between Dr. Christensen's recommended treatment and assertions of complete disability as evidence to reject her opinions.

Finally, Layne argues that the ALJ erred by granting more weight to the state-agency physicians, "who performed a medical records review only," than to Layne's treating physicians. Pl. Br. 10–11. An ALJ may rely on a non-examining physician's opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). State-agency examiner Dr. R. S. Kadian, M.D., concluded that Layne had a sedentary RFC because lupus "has resulted in several complications, but" her "body systems are fairly well controlled [with symptoms] of no more than a mild degree." R. 82. Dr. Luc Vinh, M.D., examined Layne's record four months later and affirmed Dr. Kadian's sedentary RFC assessment. R. 105.

The longitudinal record supports Dr. Kadian's and Dr. Vinh's assessments and justifies the ALJ's adoption of the functional limitations they identified. As outlined above, the record indicates that after recovering from her incarceration-related flare, Layne's lupus and related conditions have been well-controlled by her medications. *See* R. 319–22, 325–26, 783, 778, 855. *See, e,g,*, *Gross v. Heckler*, 785 F.3d 1163, 1165–66 (4th Cir. 1986) (finding that conditions

14

reasonably controlled by medication are not disabling); *Ratliff v. Barnhart*, 580 F. Supp. 2d 504, 517 (W.D. Va. 2006) (same). Likewise, diagnostic imaging and physical examinations of Layne's back consistently returned mild findings. *See* R. 362, 389, 684–85, 840, 862, 882 (diagnostic imaging and tests); R. 387, 411, 413, 467, 471, 681, 835, 853 (physical examinations). These finding do not contradict the sedentary RFC assessed by Dr. Kadian, Dr. Vinh, and the ALJ. The conservative care and mild findings evident in the longitudinal record support the ALJ's decision to reject Dr. Christensen's conclusory opinions that Layne was disabled and adopt the state-agency examiners' opinions. Thus, I find that substantial evidence supports the ALJ's RFC determination.

B. *Medical Expert Testimony*

Layne contends that the ALJ should have called a medical expert to testify at her administrative hearing because of the complexity of her conditions and the medical evidence in her record. Pl. Br. 9. The regulations give an ALJ the discretion to solicit medical expert testimony to address the nature and severity of a claimant's impairments and whether they meet or equal a listed impairment. 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii). Such testimony is not mandatory and is unnecessary when there is adequate evidence before the ALJ on which to base a decision. *See Bolling v. Comm'r of Soc. Sec.*, No. 2:12cv35, 2013 WL 5150781, at *9 (W.D. Va. Sept. 13, 2013).

The ALJ had adequate evidence before him to adjudicate Layne's case without the aid of a medical expert. The record contains 550 pages of medical records from multiple healthcare providers. R. 304–884. These records include notes from Layne's primary care provider from June 2011 through September 2012, R. 387–94, 410–15, 672–87, 775–839, notes and test results from UVAHS from December 2005 through January 2012, R. 319–86, 416–671, and the

15

opinions of two state-agency physicians, who examined Layne's medical records in August 2011, R. 81–85, and December 2011, R. 102–06. This is adequate information for the ALJ to make his decision without the aid of a medical expert. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 231 (4th Cir. 2011) (per curiam) (finding an ALJ need not have obtained medical expert testimony when he "properly based his RFC finding on Felton-Miller's subjective complaints, the objective medical evidence, and the opinions of treating, examining, and nonexamining physicians").

C.     *Additional Matters Raised at Oral Argument*

At oral argument, Layne's counsel raised two additional issues, challenging the ALJ's determination of her credibility and arguing that she suffered manipulative limitations that the ALJ did not incorporate into her RFC. Neither issue is fairly raised in Layne's brief. All counsel would do well to raise and develop all arguments in their briefs, as required by local rule, lest they risk forfeiting the argument. *See* W.D. Va. Gen. R. 4(c)(1) (requiring a plaintiff to file "a brief addressing <u>why</u> the Commissioner's decision is not supported by substantial evidence or <u>why</u> the decision otherwise should be reversed or the case remanded") (emphasis added).

Regardless, I find no merit in Layne's arguments. Layne contends that the RFC was inadequate because it did not include limitations in reaching and handling. At the administrative hearing, she testified that lupus causes swelling in her elbows and hands that affects her ability to reach and manipulate objects. R. 55–56. To begin with, on examination by Layne's counsel, the VE testified that a restriction on reaching would not have any effect on the sedentary job base. R. 73. Furthermore, the medical evidence does not corroborate Layne's report of symptoms. Dr. Rosner noted Layne's complaints of joint stiffness and swelling in April 2011, but on examination he found no edema or effusion. R. 325–26. He again noted her complaints of joint

16

pain and swelling in her hands in May 2012, but did not record any objective findings in support. R. 783–86. Musculoskeletal examinations by UVAHS physicians consistently did not reveal any swelling or stiffness in her joints. *See, e.g.*, R. 467 (Dec. 9, 2011), 461 (Jan. 20, 2012), 675–76 (Jan. 24, 2012; Layne also denied increased joint pain and swelling), 852 (Jan. 18, 2013). During her first appointment with Dr. Christensen, Layne reported swelling in her hands, fingers, and knees. R. 392. Dr. Christensen, however, noted no joint deformity or swelling in her extremities on examination. R. 393. In September 2011, Layne complained of continuing joint pain and fatigue, but Dr. Christensen again did not find objective signs of deformity or swelling in her extremities. R. 413. No doctor restricted Layne's ability to reach or manipulate, and the state-agency physicians found that she had no limitation in her ability to manipulate. R. 84, 105. Because no medical evidence supported Layne's subjective complaints of reaching or handling, the ALJ did not err in failing to include them in the RFC. *Cf. Johnson*, 434 F.3d at 658 ("Without objective medical evidence of a medically determinable impairment that could cause the symptoms Johnson suffers in her hands, the ALJ properly concluded that Johnson is not limited by a severe hand impairment.").

In addition to the lack of corroborating medical evidence, the ALJ questioned the credibility of her subjective report of symptoms. Courts should defer to an ALJ's credibility finding absent "exceptional circumstances." *Bishop*, 583 F. App'x at 68 (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011. The ALJ's determination was reasonable. The ALJ found that Layne was not forthcoming about her reason for quitting her most recent, regular employment. R. 32. Initially, Layne testified that she stopped working

17

because of lupus and back and leg problems – the same conditions that she continues to assert prevent her from working. R. 60. Later she testified that she had stolen money from her employer and left before she was caught. R. 65. She was ultimately convicted of embezzlement. R. 64–65. Layne's lack of candor in explaining why she stopped working was a reasonable ground for the ALJ to question her credibility. *Cf. Sowers v. Colvin*, 4:12cv29, 2013 WL 3879682, at*4 (W.D. Va. July 26, 2013) (claimant's inconsistent statements about his level of pain provided substantial support for ALJ's adverse credibility finding). Moreover, the ALJ reasonably questioned Layne's statements about the severity of her impairments. R. 31. As discussed above, physical examinations, objective testing, and conservative treatment do not support Layne's claims that her impairments cause disabling restrictions.

## IV. Conclusion

This Court must affirm the Commissioner's final decision that Layne is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, I recommend that the Court **DENY** Layne's motion for summary judgment, ECF No. 14, **GRANT** the Commissioner's motion for summary judgment, ECF No. 17, and **DISMISS** this case from the docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 31, 2015

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge